## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General (OIG-HHS) of the Department of Health and Human Services (HHS) (collectively, the "United States"), Matthew Samuelson, and Midwest Laboratory Sales & Consulting, LLC ("Midwest") (hereafter collectively referred to as "the Parties"), through their authorized representatives.

## RECITALS

A.     Samuelson is the sole owner of Midwest. From March 2012 through December 2017, Midwest operated a urine drug testing laboratory within a facility owned by Center for Pain Management, S.C. ("CPM"), located at 7234 West Appleton Avenue, Milwaukee, Wisconsin.

B.     On April 25, 2019, the United States intervened in an action in the United States District Court for the Eastern District of Wisconsin captioned United States ex rel. Fering v. Center for Pain Management, S.C., et al, No. 17-cv-1796 (the "Civil Action"). At the same time that the United States intervened in that action, the United States added Samuelson and Midwest as defendants and asserted claims against them.

C.     The United States contends that Midwest and Samuelson caused to be submitted false claims for payment to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 ("Medicare") and the Wisconsin Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid").

D.     The United States contends that it has certain civil claims against Midwest and Samuelson arising from their relationship with CPM, and CPM's submission of claims for urine drug tests performed by Midwest from March 12, 2012 through December 31, 2017, as more

EXHIBIT 1

fully described in the Statement of Facts attached as Exhibit A. Samuelson and Midwest admit, acknowledge, and accept responsibility for the conduct described in Exhibit A. That conduct is referred to below as the "Covered Conduct."

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

## TERMS AND CONDITIONS

1.     Samuelson and Midwest shall pay to the United States forty thousand dollars ($40,000) ("Settlement Amount"), all of which is restitution. Samuelson and Midwest shall pay the Settlement Amount as follows:

a.     No later than 10 days after the Effective Date of this Agreement, Samuelson and Midwest shall pay $20,000 by electronic funds transfer pursuant to written instructions to be provided by the United States Attorney's Office for the Eastern District of Wisconsin.

b.     No later than 180 days after the Effective Date of this Agreement, Samuelson and Midwest shall pay the remaining $20,000 by electronic funds transfer pursuant to written instructions to be provided by the United States Attorney's Office for the Eastern District of Wisconsin.

2.     Subject to Paragraph 3 (concerning excluded claims), and conditioned upon Samuelson and Midwest's full payment of the Settlement Amount, the United States releases Samuelson and Midwest from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theory of unjust enrichment.

3.      Notwithstanding the release given in paragraph 2 of this Agreement, or any other term of this Agreement, the following claims of the United States are specifically reserved and are not released:

    a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

    b.      Any criminal liability;

    c.      Except as explicitly stated in this Agreement, any administrative liability, including mandatory or permissive exclusion from Federal health care programs;

    d.      Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

    e.      Any liability based upon obligations created by this Agreement; and

    f.      Any liability of individuals (except as provided in paragraph 2 with respect to Samuelson).

4.      Samuelson has provided sworn financial disclosure statements dated July 4, 2019 (Financial Statements) to the United States, and the United States has relied on the accuracy and completeness of those Financial Statements in reaching this Agreement. Samuelson warrants that the Financial Statements are complete, accurate, and current. If the United States learns of asset(s) in which Samuelson had an interest at the time of this Agreement that were not disclosed in the Financial Statements, or if the United States learns of any misrepresentation by Samuelson on, or in connection with, the Financial Statements, and if such nondisclosure or misrepresentation changes the estimated net worth set forth in the Financial Statements by $20,000 or more, the United States may at its option: (a) rescind this Agreement and reinstate its suit based on the Covered Conduct, or (b) let the Agreement stand and collect the full Settlement Amount plus one hundred percent (100%) of the value of the net worth of Samuelson previously

failed to disclose. Samuelson agrees not to contest any collection action undertaken by the United States pursuant to this provision, and immediately to pay the United States all reasonable costs incurred in such an action, including attorney's fees and expenses.

5.    In the event that the United States, pursuant to Paragraph 4 (concerning disclosure of assets), above, opts to rescind this Agreement, Samuelson and Midwest agree not to plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any civil or administrative claims that (a) are filed by the United States within 90 calendar days of written notification to Samuelson and Midwest that this Agreement has been rescinded and (b) relate to the Covered Conduct, except to the extent these defenses were available on April 25, 2019.

6.    Samuelson and Midwest waive and shall not assert any defenses they may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

7.    Samuelson and Midwest fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Samuelson and Midwest have asserted, could have asserted, or may assert in the future against the United States, and its agencies, officers, agents, employees, and servants related to the Covered Conduct and the United States' investigation and prosecution thereof.

8.    The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare contractor (e.g., Medicare

Administrative Contractor, fiscal intermediary, carrier) or any state payer, related to the Covered

Conduct; and Samuelson and Midwest agree not to resubmit to any Medicare contractor or any

state payer any previously denied claims related to the Covered Conduct, agrees not to appeal

any such denials of claims, and agrees to withdraw any such pending appeals.

9.     Samuelson and Midwest agree to the following:

a.     Unallowable Costs Defined:  All costs (as defined in the Federal

Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social

Security Act, 42 U.S.C. §§ 1395-1395kkk-1 and 1396-1396w-5; and the regulations and official

program directives promulgated thereunder) incurred by or on behalf of Samuelson or Midwest,

any present or former officers, directors, employees, shareholders, and agents in connection with:

(1)     the matters covered by this Agreement;

(2)     the United States' audit(s) and civil investigation(s) of the matters covered

by this Agreement;

(3)     Samuelson and Midwest's investigation, defense, and corrective actions

undertaken in response to the United States' audit(s) and civil

investigation(s) in connection with the matters covered by this Agreement

(including attorney's fees);

(4)     the negotiation and performance of this Agreement; and

(5)     the payment Samuelson and Midwest make to the United States pursuant

to this Agreement;

are unallowable costs for government contracting purposes and under the Medicare Program,

Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program

(FEHBP) (hereinafter referred to as Unallowable Costs).

b.      Future Treatment of Unallowable Costs:  If applicable, Unallowable Costs shall be separately determined and accounted for by Samuelson and Midwest, and Samuelson and Midwest shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Samuelson and Midwest or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

c.      Treatment of Unallowable Costs Previously Submitted for Payment:  If applicable, Samuelson and Midwest further agree that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Samuelson or Midwest or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs.  Samuelson and Midwest agree that the United States, at a minimum, shall be entitled to recoup from Samuelson and Midwest any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies.  The United States reserves its rights to disagree with any calculations submitted by Samuelson,

Midwest, or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on any cost reports, cost statements, or information reports.

d.     Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Midwest's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

10.     Samuelson and Midwest agree to cooperate fully and truthfully with the United States' investigation of and litigation against individuals and entities not released in this Agreement. Upon reasonable notice, Samuelson and Midwest shall encourage, and agree not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. Samuelson and Midwest further agree to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

11.     This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 12 (waiver for beneficiaries paragraph), below.

12.     Samuelson and Midwest agree that they waive and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

13.     Upon receipt of the payment described in Paragraph 1.a, above, the Parties shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal of the United States' claims against Samuelson and Midwest.

14.     Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

15.     Each party and signatory to this Agreement represents that it freely and voluntarily enters in to this Agreement without any degree of duress or compulsion.

16.     This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Eastern District of Wisconsin. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

17.     This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

18.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

19.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

20.     This Agreement is binding on Samuelson, Midwest, and their successors, transferees, heirs, and assigns.

21.     All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

22.     This Agreement is effective on the date of signature of the last signatory to the Agreement (the "Effective Date"). Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

PLAINTIFF THE UNITED STATES OF AMERICA

MATTHEW D. KRUEGER
United States Attorney
Eastern District of Wisconsin

DATED: 7/24/19     BY: _____
                        Michael A. Carter
                        Lisa Yun
                        Assistant United States Attorneys
                        Eastern District of Wisconsin

DATED: 8/7/19      BY: _____
                        LISA M. RE
                        Assistant Inspector General for Legal Affairs
                        Office of Counsel to the Inspector General
                        Office of Inspector General
                        United States Department of Health and Human Services

DEFENDANTS MATTHEW SAMUELSON AND
MIDWEST LABORATORY SALES AND CONSULTING, LLC

DATED: _____     BY: _____
                         Matthew Samuelson
                         For himself and
                         Midwest Laboratory Sales & Consulting, LLC

DATED: 7/30/2019     BY: _____
                         Richard Tegtmeier
                         Counsel for Matthew Samuelson and
                         Midwest Laboratory Sales & Consulting, LLC

PLAINTIFF THE UNITED STATES OF AMERICA

MATTHEW D. KRUEGER
United States Attorney
Eastern District of Wisconsin

DATED: _____     BY: _____
                         Michael A. Carter
                         Lisa Yun
                         Assistant United States Attorneys
                         Eastern District of Wisconsin

DATED: _____     BY: _____
                         LISA M. RE
                         Assistant Inspector General for Legal Affairs
                         Office of Counsel to the Inspector General
                         Office of Inspector General
                         United States Department of Health and Human Services

DEFENDANTS MATTHEW SAMUELSON AND
MIDWEST LABORATORY SALES AND CONSULTING, LLC

DATED: 7/29/2019     BY: _____
                         Matthew Samuelson
                         For himself and
                         Midwest Laboratory Sales & Consulting, LLC

DATED: _____     BY: _____
                         Richard Tegtmeier
                         Counsel for Matthew Samuelson and
                         Midwest Laboratory Sales & Consulting, LLC

10

Exhibit A – Statement of Facts

I, Mathew Samuelson, declare under penalty of perjury that the following Statement of Facts is true and correct:

1.      I am the sole owner of Midwest Laboratory Sales & Consulting, LLC ("Midwest").

2.      In the fall of 2011, Jonathan Fering and I met Dr. Nosheen Hasan. Dr. Hasan owns a pain management practice called Center for Pain Management, S.C. ("CPM"), which operates clinics in the Milwaukee metropolitan area.

3.      In the fall of 2011, Dr. Hasan, Mr. Fering, and I discussed the establishment of a urine drug testing laboratory at CPM. Based on these conversations with Dr. Hasan, I understood that CPM regularly used urine drug testing in its pain management practice. I also understood that CPM at that time used point-of-care cup tests to screen urine samples and then sent some samples to third party laboratories, primarily Millennium Laboratories, Inc., for more sophisticated testing with laboratory analyzers.

4.      Dr. Hasan told me that she was interested in establishing a urine drug testing laboratory within CPM in order to obtain additional reimbursement from insurance. At the same time, Dr. Hasan did not want to bear the expenses of establishing and operating a laboratory. For example, Dr. Hasan did not want to purchase a laboratory analyzer or other equipment, hire laboratory staff, purchase supplies, or obtain accreditation of the laboratory.

5.      With Mr. Fering's assistance, I negotiated an arrangement with Dr. Hasan pursuant to which my company, Midwest, would bear the expenses of establishing and operating a laboratory at CPM. In exchange, Dr. Hasan agreed to refer CPM's pain management patients exclusively to Midwest for urine drug testing.

6.     As reflected in emails exchanged in October and November 2011, Dr. Hasan and I recognized that the arrangement between CPM and Midwest would provide Dr. Hasan and CPM with substantial revenue that the third party laboratories like Millennium formerly earned for performing more sophisticated laboratory testing on CPM's patients.

7.     On behalf of Midwest, I agreed to the arrangement with CPM because it promised to provide Midwest with a large, steady stream of patients for urine drug testing.

8.     Dr. Hasan and I executed a Management Services Agreement effective November 2, 2011 to memorialize the arrangement between CPM and Midwest (the "First MSA").

9.     In the First MSA, Midwest agreed to manage the day-to-day operations of the laboratory, provide the laboratory manager/director, provide all the technical personnel, provide all the equipment and supplies, and create the laboratory procedures.

10.    In exchange, CPM provided Midwest with the exclusive right to perform urine drug testing on CPM's patients. CPM also agreed to provide space within its clinic for the laboratory without charging rent to Midwest.

11.    When Dr. Hasan and I executed the First MSA, we anticipated that the analyzer Midwest planned to purchase, a Carolina Liquid Chemistries Biolis 24i, could perform "quantitative" testing. Quantitative testing is relatively sophisticated testing that can assess the amount of a drug in the urine sample. Insurance, including Medicare and Medicaid, reimbursed laboratories more for quantitative tests than "qualitative" tests, which identify only the presence or absence of a drug or drug class in a urine sample.

12.    In light of this understanding, First MSA provided Midwest $8.17 for each drug or drug class tested for each patient's urine sample. CPM would retain the remaining reimbursement. For example, if Midwest analyzed a urine sample for 10 drugs, Midwest would receive $81.70 for

analyzing that sample. If insurance paid $250 for the testing, CPM would retain the remaining $168.30.

13.     The First MSA also explicitly recognized that the amount Midwest received "will vary with actual patient volume."

14.     At the time I executed the First MSA, I recognized that, the more tests CPM ordered from Midwest, the more money Midwest would receive.

15.     I also recognized that, because CPM simply retained the difference between the amount received from insurance and Midwest's share, the amount CPM earned from the arrangement also increased as CPM ordered more tests.

16.     The First MSA also stated that CPM and Midwest intended to comply with all federal laws, including the "Medicare and Medicaid Anti-Fraud and Abuse Laws and the federal prohibition on physician self-referrals." However, I did not have any attorney or other consultant review the First MSA to determine whether it complied with any federal law, including the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), or the False Claims Act, 31 U.S.C. §§ 3729-3733. I never told Dr. Hasan that the First MSA complied with federal law.

17.     Sometime before we executed the First MSA, Dr. Hasan told me that her attorney reviewed the First MSA and said it was appropriate. I did not speak with Dr. Hasan's attorney.

18.     I did not speak with CPM's billing company, Fi-Med Management, Inc. ("Fi-Med"), about the First MSA or the arrangement between CPM and Midwest. Dr. Hasan also did not tell me that Fi-Med reviewed or approved the First MSA or the arrangement between CPM and Midwest.

19.     Following execution of the First MSA, I purchased a Biolis 24i analyzer and other equipment necessary to establish the laboratory. With Mr. Fering's assistance, I installed the

analyzer and other equipment in a former patient room at CPM's clinic at 7234 West Appleton Avenue, Milwaukee, Wisconsin.

20. With Mr. Fering's assistance, I also hired a laboratory directory, Dr. Larry Brace, and a laboratory technician, David Petsch, for Midwest to operate the laboratory.

21. I obtained a CLIA certificate of registration effective December 23, 2011 in order to permit Midwest's laboratory to perform urine drug testing with its Biolis 24i analyzer. The CLIA certificate of registration was issued in CPM's name. Despite receiving accreditation for the laboratory in CPM's name, Midwest established, operated, and paid for the laboratory. The certificate of accreditation even identified Midwest's employee, Dr. Brace, as the laboratory director.

22. Prior to the opening of Midwest's laboratory in 2012, I determined that the Biolis 24i analyzer could not, in fact, perform quantitative urine drug testing. Instead, the Biolis 24i could perform only qualitative urine drug testing. In early 2012, I understood that insurers thus provided less reimbursement for qualitative tests than quantitative tests.

23. In light of the inability of the Biolis 24i to perform quantitative tests, Dr. Hasan and I executed a second Management Services Agreement effective March 9, 2012 on behalf of CPM and Midwest (the "Second MSA").

24. The Second MSA was identical to the First MSA in all material respects except for its payment terms. The Second MSA provided that Midwest would receive $50 per patient test. In 2012, I understood that insurers, including Medicare and Medicaid, typically paid more than $50 per patient test for qualitative drug testing and that CPM would retain any reimbursement in excess of the $50 payment to Midwest.

25.   Like the First MSA, the Second MSA also recognized that the amount Midwest received "will vary with actual patient volume."

26.   Even with the new payment terms in the Second MSA, I recognized that Midwest and CPM would each receive more money as CPM ordered more tests from Midwest's laboratory.

27.   The Second MSA also stated that CPM and Midwest intended to comply with all federal laws, including the "Medicare and Medicaid Anti-Fraud and Abuse Laws and the federal prohibition on physician self-referrals."

28.   I did not have any attorney or other consultant review the Second MSA to determine whether it complied with any federal law, including the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), or the False Claims Act, 31 U.S.C. §§ 3729-3733. I never told Dr. Hasan that the Second MSA complied with federal law.

29.   I never discussed the Second MSA with any attorney retained by Dr. Hasan or with her billing company, Fi-Med Management, Inc.

30.   Midwest began operations at its laboratory at CPM's Appleton Avenue clinic on March 12, 2012. The relationship between CPM and Midwest terminated on December 31, 2017. From March 12, 2012 through December 31, 2017, CPM regularly referred patients to Midwest for qualitative drug testing.

31.   Throughout the entire relationship between CPM and Midwest, neither Dr. Hasan nor any other CPM employee participated in the day-to-day operation of Midwest's laboratory. Likewise, Dr. Hasan and CPM did not purchase any supplies, equipment, or other material used to operate the laboratory. Instead, Midwest, its employees, and I performed all the work at the laboratory. Midwest and I paid for all the supplies, equipment, and other material used to operate the laboratory.

32.     In fact, CPM stopped using the Appleton Avenue facility for its clinical operations in July 2016, yet Midwest's laboratory remained at that facility and continued to operate independently of CPM.

33.     Throughout the relationship between CPM and Midwest, CPM's staff merely collected urine samples from patients and provided them to Midwest for drug testing. CPM would have had to collect samples in the same manner if it had continued to use third party laboratories like Millennium, but would have received no reimbursement.

34.     As Dr. Hasan and I agreed, however, CPM billed under its name (through its billing company or on its own) Medicare, Medicaid, and other insurance for the urine drug tests performed by Midwest. CPM thus received the reimbursement for the tests from Medicare, Medicaid, and other insurance.

35.     To obtain Midwest's share of the revenue generated by the arrangement, I initially sent periodic invoices to CPM. In these invoices, I identified the number of tests Midwest performed for the period covered by the invoice and sought payment of $50 per test performed (consistent with the terms of the Second MSA).

36.     CPM never paid Midwest the amounts shown on Midwest's invoices. I wrote an email dated October 1, 2014 to Dr. Hasan stating that "[n]ot once did you ever pay Midwest Laboratory Sales & Consulting as per the monthly invoice."

37.     Because CPM was not paying the amounts shown on the invoices, I stopped sending invoices to CPM in about September 2012. Instead, CPM simply provided Midwest a portion of the reimbursement received from Medicare, Medicaid, and other insurers for the urine drug tests. As Dr. Hasan confirmed in an email to me dated October 3, 2014, "I pay you according to the number of labs that fimed [sic] tells me that we get reimbursed for."

38.     Dr. Hasan told me that CPM provided Midwest with approximately 50% of the insurance reimbursement received for urine drug tests.

39.     Throughout the arrangement between CPM and Midwest, I understood that CPM would continue to refer Medicare, Medicaid, and other patients for urine drug testing to Midwest's laboratory only if I agreed to split with CPM and Dr. Hasan the Medicare, Medicaid, and other insurance reimbursement Midwest earned for urine drug tests.

40.     I initially accepted this 50/50 split of reimbursement because I needed money to pay Midwest's business loans and continued to accept it because I was earning a sufficient living from the arrangement.

41.     Because CPM only paid Midwest for tests for which insurance paid reimbursement, if insurance did not pay for a test performed by Midwest for whatever reason, CPM paid Midwest nothing for the test despite the costs incurred by Midwest to perform the test. I did not take any action to try to force CPM to pay Midwest for such tests because I wanted CPM and Dr. Hasan to continue to refer Medicare, Medicaid, and other patients for testing at Midwest.

42.     Throughout the arrangement between CPM and Midwest, I was aware that federal law prohibited Midwest and me from paying kickbacks or other payments to induce physicians to refer patients to Midwest for urine drug testing for which Medicare and Medicaid paid.

43.     I also was aware that Medicare and Medicaid would not pay claims for services for which Midwest or I paid kickbacks or other payments to physicians to induce referrals for the services to Midwest.

44.     Nonetheless, during the arrangement between CPM and Midwest, I recognized that Midwest and I paid remuneration in the forms of an unearned split of Medicare and Medicaid

reimbursement and free drug testing to CPM and Dr. Hasan in exchange for the referral of Medicare and Medicaid patients to Midwest for testing.

45.    For example, in an email dated August 3, 2013, I wrote to Dr. Hasan about a late payment from CPM to Midwest. To encourage payment, I stated: "CPM is enjoying a huge windfall of free revenue" from the laboratory and that Midwest "has provided CPM with a very large, expense-free revenue stream and a very good service line. It makes no business sense what-so-ever to starve the cash cow!" In this email, I sought to obtain the late payment from CPM by reminding Dr. Hasan that CPM received a share of the insurance reimbursement for urine drug tests performed by Midwest, despite the fact that CPM did nothing to earn that share.

46.    In an email response dated August 3, 2013, Dr. Hasan wrote to me that "it's a mutually beneficial endeavor" and that Midwest "pays no rent" for its laboratory space. In another email dated August 5, 2013, Dr. Hasan wrote to me that "I GENERATE THE BUSINESS" for Midwest's laboratory. I understood Dr. Hasan's emails to threaten the loss of continued referrals to Midwest if I continued to press for additional payments.

47.    In an email dated April 16, 2014, I stated to Dr. Hasan that "our current arrangement" caused Midwest to assume "**ALL** the loss" when insurance did not provide reimbursement for urine drug tests. I continued: "We are in this together. We should be sharing in the profit, and equally in the assumed loss. . . . [Y]ou have enjoyed a very healthy, almost pure profit." In this email, I sought to remind Dr. Hasan that Midwest was providing free testing to CPM in those instances in which insurance did not provide reimbursement.

48.    In an email response dated April 16, 2014, Dr. Hasan replied to me, stating: "You make it sound like I am the only person benefitting[.] The MOST important fact that you are missing is that these are my patients without them you will have no lab." I understood Dr. Hasan's email to

threaten the loss of continued referrals to Midwest if I pressed for money for tests for which insurance provided no reimbursement.

49.   In another example, I wrote Dr. Hasan a letter attached to a December 12, 2017 email. Regarding the absence of work by CPM in the laboratory operation, I wrote: "your staff was collecting [urine] specimens before I built the lab and you were getting paid NOTHING for this! For the last 7 years I've made sure you're getting paid VERY WELL for collecting the specimens."

50.   In the December 2017 letter, I sought to remind that Dr. Hasan that CPM retained a share of Medicare and Medicaid reimbursement for the drug tests simply because CPM collected urine samples and sent them to Midwest. In other words, Midwest paid CPM a share of the reimbursement in exchange for referrals.

51.   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  7/3/19

Matthew Samuelson