UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,
ex rel. Jonathan B. Fering,

        Plaintiffs,

  v.

CENTER FOR PAIN MANAGEMENT, S.C.,
*et al.*,

        Defendants.

Civil Action No. 17-cv-1796

---

Local Rule 7(j)(2) Unpublished Opinions Cited by the Government's Opposition to Defendants' Motion for Summary Judgment

---

1. Modern Medical Laboratories, Inc. v. Smith-Kline Beecham Clinical Laboratories, Inc., No. 92-c-5302, 1994 WL 449281, Med & Med GD (CCH) P 42,754 (N.D. Ill. Aug. 17, 1994).

2. United States ex rel Bell v. Cross Garden Care Center, LLC, No. 16-cv-961, 2019 WL 6493972 (M.D. Fla. Dec. 3, 2019).

Dated this 2nd day of January, 2020.

                                          MATTHEW D. KRUEGER
                                          United States Attorney

                       By:    /s Michael Carter

                                   MICHAEL CARTER
                                   LISA YUN
                                   Assistant United States Attorneys
                                   Eastern District of Wisconsin
                                   State Bar No. 1090041
                                   State Bar No. 1078905
                                   517 East Wisconsin Avenue
                                   Milwaukee, WI 53202
                                   (414) 297-4101
                                   Fax: (414) 297-4394
                                   Michael.A.Carter@usdoj.gov
                                   Lisa.Yun@usdoj.gov

KeyCite Yellow Flag - Negative Treatment
Distinguished by Debartolo v. HealthSouth Corp., N.D.Ill., October 17, 2006

1994 WL 449281
United States District Court, N.D. Illinois, Eastern Division.

MODERN MEDICAL LABORATORIES, INC., Plaintiff,
v.
SMITH–KLINE BEECHAM CLINICAL LABORATORIES, INC., a/k/a Smith–Kline Bio Science Laboratories, Ltd., Defendant,
SMITH–KLINE BEECHAM CLINICAL LABORATORIES, Counter–Plaintiff,
v.
MODERN MEDICAL LABORATORIES, INC., Counter–Defendant.

No. 92 C 5302.
|
Aug. 17, 1994.

*MEMORANDUM OPINION*

KOCORAS, District Judge:

**\*1** This matter is before the Court on the plaintiff's objections to the magistrate judge's Report and Recommendation on cross motions for summary judgment. For the reasons that follow, we overrule the objections and accept the magistrate judge's recommendation.

BACKGROUND

This case concerns an alleged breach of a contract between the plaintiff, Modern Medical Laboratories, Inc. ("MML"), and the defendant, Smith–Kline Beecham Clinical Laboratories, Inc. ("Smith–Kline").[1] The contract was called a Co-operative Management Agreement ("the Agreement") and provided that a division of ICL would market, manage, and operate MML's laboratory business and facilities in exchange for 90% of the revenue generated from MML's customers and territory. MML was to receive 10% of the revenue.

Work was performed and payments were made according to the terms of the contract for some time. MML asserts that the ICL division committed certain breaches of the Agreement that are not relevant to our discussion here. Upon Smith–Kline's takeover of ICL, Smith–Kline advised MML that it would not make further payments under the Agreement because it believed the Agreement could be illegal under the Medicare–Medicaid Anti–Fraud and Abuse Amendments ("the Act"), 42 U.S.C. § 1320a–7b.

MML brought this action, which is essentially a breach of contract action. The Second Amended Complaint contains a count seeking a declaration that the Agreement does not violate the Act, a count alleging that the Act is unconstitutional, and a breach of contract count. Smith–Kline filed a counterclaim, seeking payment by MML of $85,000, plus interest, due under the Agreement, and additionally or alternatively, a declaration that the Agreement was void for illegality.

MML filed a motion for partial summary judgment on its declaratory judgment count. Smith–Kline responded with a cross-motion for summary judgment on all counts of the Second Amended Complaint. We referred the motion to Magistrate Judge Lefkow. She prepared a Report and Recommendation recommending that Smith–Kline's motion be granted and that MML's motion be denied. MML has filed objections to the Report and Recommendation, which we now review.

LEGAL STANDARD

The United States Magistrates Act, as amended, allows district court judges to refer pre-trial motions to magistrate judges, who read the submissions of the parties, hold hearings if necessary, and prepare reports and recommendations. *See* 28 U.S.C. § 631 et seq. Our standard of review of the magistrate judge's recommendation is defined by 28 U.S.C. § 636(b)(1). For dispositive motions, the statute requires that the

district court judge "make a de novo determination of those portions of the [magistrate judge's] ... recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "A district judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.*

Referring motions to magistrate judges is intended to help ease the heavy workloads of the district courts and to aid in the efficient resolution of the disputes. *Anna Ready Mix, Inc. v. N.E. Pierson Constr. Co.,* 747 F.Supp. 1299, 1302–03 (S.D.Ill.1990). Efficiency in judicial administration requires that all arguments be presented to the magistrate judge in the first instance. *Anna Ready Mix,* 747 F.Supp. at 1303. Absent compelling circumstances, the review procedure is not an opportunity to present new arguments not raised before the magistrate judge. *Id.* at 1303. It is with these principles in mind that we review the objections before us.

## DISCUSSION

**\*2** The cross motions for summary judgment center around the legality of the Agreement in light of the Medicare–Medicaid Anti–Fraud and Abuse Amendments, 42 U.S.C. § 1320a–7b. The magistrate judge determined that future performance of the Agreement would be illegal and thus, found that failure to perform the Agreement was excusable. MML makes three objections to the magistrate judge's report. First, MML challenges the magistrate judge's interpretation of the Act. Second, MML objects that the magistrate judge went beyond the evidence and speculated that the Agreement could result in higher prices being charged for laboratory work. Finally, MML asserts that the magistrate judge should have granted it some relief even if future performance of the Agreement is illegal.

We begin with the first objection. The Act provides in relevant part as follows:

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made

> in whole or in part under subchapter XVIII of this chapter or a State health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under subchapter XVIII of this chapter or a State health care program,
>
> shall be guilty of a felony ...

42 U.S.C. § 1320a–7b(b).

An analysis of whether the Agreement violates this portion of the statute requires us to determine what actors are within the reach of the statute and what acts are prohibited. The first question is easy: "whoever" does the prohibited acts is liable. Now we must analyze the prohibited acts. The first portion of the statute quoted above provides that, "whoever (knowingly and willfully) solicits or receives any remuneration ... in return for referring an individual to a person for the furnishing (or arranging for the furnishing) of any item or service [for which Medicare payments may be made] ... shall be guilty of a felony." 42 U.S.C. § 1320a–7b(b)(1)(A) (parentheses added for purposes of clarification). The second portion of the statute quoted above makes it a felony to knowingly and willfully receive remuneration "in return for ... arranging for ... purchasing ... any ... service, or item [for which Medicare payments may be made]." 42 U.S.C. § 1320a–7b(1)(B).

It is established that MML receives remuneration and that Medicare payments may be made for laboratory work; thus, these elements of both subsections of the statute are met. We will set aside the scienter question for a moment to focus on whether the remuneration is *in return for referring an individual to a person for the furnishing of any item or service, or in return for arranging for the purchasing of any service.*

**\*3** MML urges, and the magistrate judge rejected, the proposition that MML did not violate subsection (A) of the statute because it did not refer an individual to a person for the furnishing of laboratory service. MML argues that only physicians (and in some instances, law enforcement personnel) can lawfully order medical testing and thus, that MML is without power to refer individuals to the other laboratory for testing. The magistrate judge rejected this proposition because she found that sending individuals' test specimens to another lab was analogous to referring individuals to persons for the furnishing of services, which is prohibited under the statute. MML

objects to this analogy.

While we find that the analogy is supportable under the case law and legislative history cited by the parties and analyzed by the magistrate judge, we find that it is not necessary to employ an analogy to find a violation of the Act. Specifically, subsection (B) prohibits receiving remuneration in return for arranging for the purchasing of any Medicaid-reimbursable service. As we read this subsection, it criminalizes broker-style arrangements whereby one entity receives remuneration for placing business with another entity. Under this subsection, it is irrelevant that a physician made the initial decision to purchase certain testing services. As we read it, this subsection reaches activity whereby one entity receives remuneration for essentially taking the physician's "order" for laboratory tests and arranging for another entity to perform the work. In this case, MML arranged for laboratory testing services to be purchased from ICL, and MML received remuneration for that. This arrangement, we find, falls within the activity prohibited by subsection (B).

We now briefly examine the legislative history and purpose of the Act and the decisions of other courts that have confronted the question. There is no binding authority for us to follow. However, Smith–Kline cited several cases which the magistrate judge analyzed in her report. The magistrate judge noted that MML did not cite any cases expressing support for its interpretation of the statute; instead, MML sought to distinguish the cases cited by Smith–Kline. MML does not cite any cases in its objections, either.

The magistrate judge wrote a thorough analysis of the cases and based on our own careful reading of the cases, we agree with her analysis. In *U.S. v. Bay State Ambulance & Hospital Rental Service,* 874 F.2d 20 (1st Cir.1989), the person receiving remuneration was not a physician, or at least was not working with patients. Instead, he was the director of training for a city hospital and a member of the bid committee for the procurement of ambulance services. He did not receive remuneration by referring patients to the ambulance service, but rather received cars and cash from the ambulance service for using his position on the bid committee to award the city ambulance contract to Bay State. Some of the ambulance runs would be paid for by Medicare or Medicaid. A jury convicted Bay State Ambulance and the individual defendant, John Felci, under the Fraud and Abuse Act.

**\*4** MML, like Felci, was in a position to determine that one lab and not another would perform the tests on samples sent to MML, and MML received remuneration for referring work to that lab. This, we believe, supports the conclusion that the Agreement was not legal under the Act. *See infra;* 42 U.S.C. § 1320a–7b(1)(B).

Further support for that conclusion comes from *U.S. v. Kats,* 871 F.2d 105 (9th Cir.1989). In *Kats,* one lab collected samples from doctors' offices and billed Medicare and Medi–Cal (a state program) for testing on those samples. However, the first lab performed no testing; instead, it sent the samples to a second lab and paid that lab 50% of the amount it received from Medicare and Medi–Cal. The appellant in *Kats* owned an interest in the second lab. The Ninth Circuit Court of Appeals affirmed the appellant's conviction under section 1320a–7b. The underlying factual situation is quite similar to the facts here, and the fact of conviction lends support to the notion that not only physician-lab arrangements but also lab-lab arrangements can be violative of the Act. We note, though, that the Ninth Circuit was not presented with the interpretive question that we face here.

We are also mindful of the Congressional intent underlying the statute. MML's revenue-sharing arrangement clearly seems to be the type of activity that Congress intended to criminalize, because such arrangements have the tendency to increase the prices charged to Medicare and Medicaid. *See Greber,* 760 F.2d at 71 (expressing concern over the "potential for unnecessary drain on the Medicare system"). In its second objection, MML complains that the magistrate judge improperly theorized that such an arrangement could drive up prices charged for laboratory work. We recognize that there was no evidence on this point. However, such a result is certainly not unlikely. Further, we note that price inflation is not an element that needs to be proven to establish a violation; thus, the magistrate judge's discussion (and our discussion here) of potential price effects is not part of the resolution of the question of illegality.

For the reasons just discussed, we conclude that the Agreement had all of the elements of being violative of the Act, except the scienter element may or may not have been present. However, performance of the contract after this ruling would definitely constitute a knowing and willful violation and thus, future performance would be illegal.

Should we leave the parties where we found them, since we have determined they are parties to a contract for an illegal purpose? In its third objection to the Report and Recommendation, MML suggests several alternative remedies. MML's position is that it was damaged by

ICL's actions of taking over its customers and allowing its laboratory lease to expire, and that it is entitled to equitable relief. Smith–Kline objects to the suggested remedies, arguing that they were not raised before the magistrate judge. It is true that all relevant arguments are to be raised before the magistrate judge in the first instance. *Anna Ready Mix,* 747 F.Supp. at 1302–03. That requirement was met here, in that MML addressed remedies to some degree in its summary judgment memoranda.

**\*5** The magistrate judge implicitly recommended leaving the parties where we found them. This is in accordance with the general rule that the courts will not assist either party to an illegal contract. *E.g., Manning v. Metal Stamping Corp.,* 396 F.Supp. 1376, 1378 (N.D.Ill.1975) (*citing Smythe v. Evans,* 209 Ill. 376, 70 N.E. 906 (1904)), *aff'd without op.,* 530 F.2d 980 (7th Cir.1976). We will follow the general rule here. We will not order MML to repay the $85,000 advance it received from ICL under the Agreement, nor will we order Smith–Kline to pay any damages to MML. Smith–Kline was a latecomer to this arrangement and had no part in its making. Thus, we do not find that it would be equitable to exact damages from Smith–Kline to benefit MML, which was a party to the contract. Likewise, we do not find that the equitable relief of an injunction against Smith–Kline, prohibiting it from soliciting or servicing any of MML's clients, is appropriate here. MML has no laboratory or employees to perform testing for these clients, so it would gain nothing from such an injunction.

Of course, some exceptions to the general rule of non-interference by the courts exist. Williston has recognized that a party to a contract that does not necessarily involve an illegal act, but which results in a slight violation of the law, may recover on the contract, if the violation does not seriously offend public policy or seriously injure the public welfare. 6 Williston, Contracts § 1767 (Rev. ed. 1938), *as cited in Amoco Oil Co. v. Toppert,* 56 Ill.App.3d 595, 598, 371 N.E.2d 1294, 1297 (Ill.App.Ct.1978). Here, Congress has found Medicare and Medicaid fraud and abuse to be such a serious concern that it has made it a felony. In light of this policy determination, we conclude that the above-noted exception cannot apply here. Accordingly, we will leave the parties in their present statures.

Our decision that the Agreement was prohibited by the Act makes appropriate the entry of summary judgment against MML on Count I of the Second Amended Complaint. Smith–Kline's Counterclaim was the converse of Count I. The Counterclaim sought a declaration that future performance of the Agreement would be illegal. Flowing from our disposition of Count I above, summary judgment in Smith–Kline's favor on the Counterclaim is appropriate. Our decision here also forecloses MML from succeeding on Counts II and III of its Second Amended Complaint, so we enter summary judgment for Smith–Kline on those counts as well.

## CONCLUSION

For the reasons stated above, we approve and adopt the magistrate judge's recommendation. Accordingly, we grant the defendant's motion for summary judgment and deny the plaintiff's motion for partial summary judgment.

**All Citations**

Not Reported in F.Supp., 1994 WL 449281, Med & Med GD (CCH) P 42,754

## Footnotes

1      The contract was between MML and a division of International Clinical Laboratories, Inc. ("ICL"). ICL was acquired by Smith–Kline in a hostile takeover in 1988. Smith–Kline assumed the rights and obligations of ICL in the MML–ICL contract.

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 6493972
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

The UNITED STATES of America, The State
of Florida, ex rel. Delia Bell, Plaintiffs/Relator,
v.
CROSS GARDEN CARE CENTER,
LLC and Karl E. Cross, Defendants.

Case No. 8:16-cv-961-T-27AEP
|
Signed 12/03/2019

**Attorneys and Law Firms**

[Robert Scott Oswald](), The Employment Law Group, PC, David L. Scher, Hoyer Law Group, PLLC, Washington, DC, [Jessica L. Hoyer](), [Sean Estes](), Hoyer Law Group, LLC, Tampa, FL, for Plaintiffs/Relator.

[Andrew Seth Ittleman](), [Christopher M. David](), [Christopher John Rajotte](), [Michael B. Kornhauser](), Fuerst Ittleman David & Joseph, PL, Miami, FL, for Defendants.

### ORDER

[JAMES D. WHITTEMORE](), United States District Judge

**\*1 BEFORE THE COURT** are motions to dismiss Relator Bell's Second Amended Complaint from Defendants Cross Garden Care Center, LLC (Dkt. 91) and Karl Cross (Dkt. 102), and Bell's responses in opposition (Dkts. 99, 110). Upon consideration, the motions are **GRANTED in part** and **DENIED in part.** The claims against Defendant Tabatha Cross have been dismissed (Dkt. 118), and her motion to dismiss is therefore **DENIED** as moot. (Dkt. 103).

### I. FACTUAL ALLEGATIONS

This action alleges violations of the federal False Claims Act (FCA) and the Florida False Claims Act (FFCA) for claims relating to medical services and the length of patient stays submitted by a skilled nursing facility to the Center for Medicare and Medicaid Services (CMS). The United States and the State of Florida have elected not to intervene in the action. (Dkts. 31-32).

Accepting the allegations of the Complaint as true, Defendant Karl Cross is the founder of Cross Senior Care, a chain of skilled nursing facilities including the Cross Garden Care Center (CGC) facility. (Dkt. 81 ¶ 18). Relator Bell is a former administrator of the CGC facility, which was owned by Defendant Cross Garden Care Center, LLC (Cross Garden). (Id. ¶¶ 4, 16, 19). She reported directly to Karl Cross. (Id. ¶ 49).

Bell alleges that Defendants engaged in several practices she argues constitute violations of the FCA. For example, she contends that CMS covers the cost of a patient's first 100 days in a skilled nursing facility and, beyond this period, the patient is required to cover costs. (Id. ¶ 2, 40). She alleges Defendants "required their medical staff to keep patients on service for 100 days without regard to patient welfare or medical necessity ... to maximize reimbursement from Medicare." (Id. ¶ 3). More specifically, she alleges "[a]s she reviewed ... utilization reports, she noticed that Karl Cross and [Cross Garden] kept track of how many days a resident had remaining under Medicare's 100 day Benefit Period," that "once a patient reached 100 days, CGC, at the direction of Karl Cross, immediately discharged the patient," and that Defendants "refused to discharge any, or virtually any, Medicare patients before they reached the end of the 100 day Benefit Period." (Id. ¶¶ 68-70). Relatedly, she alleges that Defendants "falsely readmitted patients in order to reset the 100 day Benefit Period," such as patient W.S. who was readmitted after three to four day transfers to Palmetto Psychiatric Unit. (Id. ¶¶ 71-76). She was aware of the practice because she "personally observed [W.S.'] treatment." (Id. ¶ 79). The Complaint provides the initials of other patients who allegedly stayed at Cross Garden's facilities for 100 days during multiple benefit periods. (Id. ¶ 81).[1]

**\*2** Next, Bell alleges that, as an administrator, she noticed "that many of the facility's residents did not require therapy services and were not eligible for treatment at the [skilled nursing facility]" but nonetheless received services. (Id. ¶ 50). The Complaint mentions a patient, W.S., who suffered [schizophrenia]() and was able to perform everyday functions without assistance. (Id. ¶ 51). Defendants allegedly provided occupational and physical therapy services to him and submitted claims for reimbursement. (Id. ¶ 52-53). Another patient, J.P., could walk without assistance and refused therapy services. (Id. ¶ 57-58). Practitioners performed bedside therapy in the form of "a few minutes of stretching

© 2020 Thomson Reuters. No claim to original U.S. Government Works.    1

from time to time." (Id. ¶ 59). Bell personally observed the treatment of W.S. and J.P. (Id. ¶¶ 55, 62).

Bell also alleges Defendants categorized patients into higher Resource Utilization Group (RUG) levels to obtain higher reimbursements. (Id. ¶ 100). Rehab therapy is classified by different RUG levels, with higher levels resulting in higher Medicare reimbursement. (Id. ¶¶ 41, 47-48). And patients "with a high level of independence are not good candidates for rehab therapy," while patients who are "extremely sick, unable to participate, and have a poor rehab prognosis are not good candidates for rehab therapy." (Id. ¶¶ 43-45). She also alleges that Karl Cross "routinely wrote e-mails to the effect of, 'We need to get these RUG levels up.' " (Id. ¶ 66).

Finally, Bell contends that Medicaid patients in Florida receive an allowance of $105 per month while in a skilled nursing facility, and that the CGC facility "took money out of the patients' individual accounts and placed it in a general facility account." (Id. ¶ 85-87). "Karl Cross then used the money from this general account to purchase furniture for the [skilled nursing facility]." (Id. ¶ 88). The Complaint includes as an example Karl Cross removing $400 from W.S.' account to purchase a $90 television. (Id. ¶ 89-90). And "nurses complained to Bell that they were prevented from providing therapy services to Medicaid patients because Medicaid reimbursed at a lower level than Medicare for such services." (Id. ¶ 93).

Bell brings three claims against Defendants. Count I alleges a violation of the FCA, 31 U.S.C. § 3729(a)(1)(A), for knowingly presenting a false claim for payment in the form of billing unnecessary therapy services, falsely inflating RUG levels, unnecessarily retaining patients for 100 days, and improperly resetting the 100-day benefit period for readmitted patients. (Id. ¶¶ 99-100). Count II alleges a violation of § 3729(a)(1)(B) for making a false record or statement to a false claim when Defendants "created false narratives in patient notes to justify their decision to provide services in excess of what is medically necessary." (Id. ¶¶ 104-05). Bell brings Count III under the FFCA, Fla. Stat. § 68.082(2)(a), alleging Defendants "appropriate[d] patient allowances and us[ed] those funds to purchase furniture and equipment for their facilities." (Id. ¶¶ 109-10).

Defendants raise four arguments for dismissal.[2] First, they argue the Complaint does not allege fraud with particularity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure.

Second, they contend that Bell invoked an incorrect basis for the Court's supplemental jurisdiction over the FFCA claim and that the conduct giving rise to the FFCA claim is not part of the same transaction or occurrence as the FCA claim. Third, they contend the Middle District of Florida is an improper venue. Finally, they argue the Second Amended Complaint is an impermissible shotgun pleading. (Dkts. 92, 102).

## II. STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "plead all facts establishing an entitlement to relief with more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.' " *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2008) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citation omitted). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

## III. DISCUSSION

*\*3* The motions are due to be granted in part and denied in part. The allegations in Count I satisfy Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure, but the allegations supporting Count II do not. Second, the FFCA claim in Count III is due to be dismissed because the factual allegations giving rise to the FFCA claim are not part of the same transaction or occurrence as the FCA claim. Third, the Middle District of Florida is a proper venue for this action. Finally, Defendants' contention that the Complaint is a shotgun pleading is not a basis to dismiss the action.

1. Specificity of the Allegations Stating an FCA Claim

The FCA imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)

(1)(A), or knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim, § 3729(a)(1)(B). "To prevail on an FCA claim, the plaintiff must prove that the defendant (1) made a false statement, (2) with scienter, (3) that was material, (4) causing the Government to make a payment." *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1284 (11th Cir. 2019) (citation omitted); *see also United States ex rel. Sharpe v. Americare Ambulance*, No. 8:13-cv-1171-T-33AEP, 2017 WL 2840574, at *4 (M.D. Fla. July 3, 2017); *Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, No. 6:09-CV-1002-ORL-31, 2014 WL 2968251, at *3 (M.D. Fla. July 1, 2014).

Moreover, an FCA complaint must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002). This is satisfied if the complaint alleges "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (internal quotation marks and citations omitted).

Rule 9(b) does not permit a relator "merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311 (citation omitted). Rather, there must be "some indicia of reliability ... in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." *Id.* (emphasis in original). As the Eleventh Circuit explains:

> The key inquiry is whether the complaint includes "some indicia of reliability" to support the allegation that an actual false claim was submitted. One way to satisfy this requirement is by alleging the details of false claims by providing specific billing information—such as dates, times, and amounts of actual false claims or copies of bills. In other circumstances, [the Eleventh Circuit]

has deemed indicia of reliability sufficient where the relator alleged direct knowledge of the defendants' submission of false claims based on her own experiences and on information she learned in the course of her employment.... However, the basis of this direct knowledge must be pled with particularity.

*United States ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 789 (11th Cir. 2018) (internal citations omitted). [3]

**\*4** Defendants contend Counts I and II fail to allege the submission of a false claim, scienter, falsity, and materiality. (Dkt. 91 at 4-5). Although a close call, the allegations are sufficient to state a claim for presentment of a false claim, but not a false statement in connection with a claim.

*Count I: Presentment of a False Claim*
Bell raises tour alleged practices of Defendants to support Count I: unnecessary therapy, inflated RUG levels, and maximizing and resetting 100-day benefit periods. While some of the allegations suffer deficiencies,[4] Count I states an FCA claim with the required specificity.

Turning to Bell's Complaint, she supports her claim of unnecessary services by noting that patient W.S. was able to perform everyday functions yet received therapy. (Dkt. 81 ¶¶ 50-51). And although another patient, J.P., could walk without assistance and refused therapy, Defendants' practitioners nonetheless assisted him at his bedside with stretching, which was submitted as a claim for therapy services. (Id. ¶¶ 58-59). Although she does not provide detail of any particular claims that were submitted, Bell "personally observed" the treatment of W.S. and J.P. (Id. ¶¶ 55, 62).

She also alleges that Defendants "required their medical staff to keep patients on service for 100 days ... without regard to patient welfare or medical necessity ... to maximize reimbursement from Medicare." (Id. ¶ 3). In support, she alleges that "[a]s she reviewed ... utilization reports, she noticed that Karl Cross and [Cross Garden] kept track of how many days a resident had remaining under Medicare's 100 day Benefit Period," that "once a patient reached 100 days, CGC, at the direction of Karl Cross, immediately discharged the patient," and that Defendants "refused to

discharge any, or virtually any, Medicare patients before they reached the end of the 100 day Benefit Period." (Id. ¶¶ 68-70). The Complaint lists other patients who allegedly stayed at facilities unnecessarily for 100 days, including for multiple periods. (Id. ¶¶ 71-76, 81). She was aware of the practice, since she "personally observed the patients remaining in care far longer than necessary, and often on multiple 100-day cycles, and because she had access to Defendants' records to confirm the accuracy of her personal observation." (Id. ¶¶ 79, 82).

At least in part, Bell alleges that Defendants billed Medicaid for unnecessary medical services. Courts have found such claims actionable under the FCA. *See, e.g.*, *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376-77 (5th Cir. 2004); *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 742 (10th Cir. 2018) (reversing dismissal on claim for unnecessary treatment). Notwithstanding, the FCA requires that an actionable statement must be known to be false. *Riley*, 355 F.3d at 376-77 (finding allegations sufficient where plaintiff asserted defendants knowingly ordered unnecessary services, admitted patients, and "artificially upgraded" organ transplant status); *see also United States v. Adams*, 371 F. Supp. 3d 1195, 1215 (N.D. Ga. 2019) (citing *Riley* in finding allegation that defendants ordered treatment "knowing [it] was unnecessary" sufficient to establish falsity). In refusing to dismiss an FCA claim, the court in *Adams* noted that the medical provider could not "avoid" allegations of unnecessary medical treatment "simply by arguing that, in his own view, the treatments he administered were medically necessary." 371 F. Supp. 3d at 1212. (citation omitted); *see also United States ex rel. Conroy v. Select Med. Corp.*, 211 F. Supp. 3d 1132, 1154 (S.D. Ind. 2016) (finding that in length of stay case, "[c]ontrary to [defendant's] suggestion, Relators need not prove at this stage the clinical merits of [the doctor's] decision to transfer [a patient]").

 **\*5**  Even if the FCA requires objective falsity,[5] the allegations of objectively unnecessary treatment, including maximizing 100-day stays and improperly resetting the benefit period, would satisfy this requirement. Indeed, courts have allowed claims alleging unnecessary maximization of the 100-day benefit period. *See, e.g.*, *United States ex rel. Integra Med Analytics, LLC v. Creative Solutions in Healthcare, Inc.*, No. SA-17-CV-1249-XR, 2019 WL 5970283, at \*2 (W.D. Tex. Nov. 13, 2019); *United States v. SavaSeniorCare, LLC*, No. 3:11-00821, 2016 WL 5395949, at \*5 (M.D. Tenn. Sept. 27, 2016); *United States v. Life Care Centers of Am., Inc.*, No. 1:08-CV-251, 2014 WL 11429265, at \*4 (E.D. Tenn. Mar. 26, 2014).

Moreover, Bell alleges that the false claims were submitted to CMS and payments were made. (Dkt. 81 ¶¶ 53, 60, 77, 81, 100). In terms of indicia of reliability, rather than "provid[e] specific billing information," Bell alleges "direct knowledge of the defendants' submission of false claims based on her own experiences and on information she learned in the course of her employment." *HPC Healthcare, Inc.*, 723 F. App'x at 789; *see also United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1230 (11th Cir. 2012) (noting "more toleran[ce] toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct").

Bell notes that she personally observed patients who received unnecessary treatment and had access to their records and utilization reports, which included "the patient's name, treatment regimen, RUG level, insurance information, and the number of days that the patient has spent in the facility." (Dkt. 81 ¶ 63-65). Unlike *Clausen* and *Corsello v. Lincare, Inc.*, 428 F.3d 1008 (2005), upon which Defendants rely, she has provided some detail about amounts of charges, dates, and billing policies, and she limits her claim to matters about which she alleges personal knowledge. And it is not fatal to her claim that she did not work in a skilled nursing facility's billing department. *See United States v. Med-Care Diabetic & Med. Supplies, Inc.*, No. 10-81634-CIV-RYSKAMP/HOP, 2014 WL 12279512, at \*9 (S.D. Fla. Dec. 23, 2014). These allegations are sufficient to survive at the motion to dismiss stage.[6]

 **\*6**  As for scienter, Bell alleges that Defendants "knowingly" submitted false claims.[7] (Dkt. 81 ¶¶ 99-100). She also points out that one of the medical providers at the CGC facility, former Defendant Tabatha Cross, is among the most prolific billers of Medicare for nursing facility evaluations in Florida. (Dkt. 81 ¶¶ 22-23); *cf. Pandya*, 389 F. Supp. 3d at 1222 (finding "at a minimum, deliberate ignorance or reckless disregard of ... falsity" where government alleged, among other things, a "dramatic increase in Medicare billing following the retirement of [a former employer]"). Bell alleges personal knowledge of patient records, which reflected that several patients stayed at the skilled nursing facility for 100 days before being readmitted with a reset

© 2020 Thomson Reuters. No claim to original U.S. Government Works.   4

benefit period. And Karl Cross' alleged statement, "We need to get these RUG levels up," suggests Defendants knowingly sought to maximize Medicare reimbursements. See *United States v. Life Care Centers of Am., Inc.*, 114 F. Supp. 3d 549, 555 (E.D. Term. 2014) (denying summary judgment where, among other things, supervisors directed employees to increase RUG levels). Additionally, she alleges that when she complained about Defendants' practices, Karl Cross "insisted on billing Medicare for the unnecessary medical services." (Dkt. 81 ¶ 4).

Finally, Defendants contend Count I does not plead materiality with the required level of specificity, but they limit their discussion to the practice of resetting the 100-day benefit period.[8] (Dkt. 91 at 16-17). First, this fails to acknowledge the allegations of maximizing 100-day stays and providing unnecessary medical services. Second, Defendants reason that "the only way a [skilled nursing facility's] alleged 're-setting' of a patient's benefit period ... could be material in this context is if, when making a claim for payment, a [skilled nursing facility] makes a representation to the Government regarding the amount of time left on the patient's benefit period, and that this representation influences ... the Government's payment decision." (Id. at 17). It is plausible, however, that a claim for a patient's stay in a skilled nursing facility is nonetheless false if it did not properly fall within the 100-day benefit period. See *Adams*, 371 F. Supp. 3d at 1213-14 (denying motion to dismiss where claim submitted was not reimbursable and in violation of Medicare manual); *see also United States ex rel. Ortiz v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443, 452 (S.D.N.Y. 2017) ("[T]here have been numerous cases imposing FCA liability ... based on violations of Medicare manual provisions."); 42 C.F.R. § 413.335(a) (providing that "[u]nder the prospective payment system, [skilled nursing facilities] receive a per diem payment of a predetermined rate for inpatient services furnished to Medicare beneficiaries").

In sum, the allegations in Count I state an FCA claim, and this part of the motion is therefore due to be denied.[9]

### Count II – Making a False Record or Statement to a False Claim

Count II alleges without elaboration that "CGC, at the direction of Karl Cross, with services being performed, at least in part, by [Tabatha] Cross, knowingly made or caused to be made a false record or statement to a false claim when they created false narratives in patient notes to justify their decision to provide services in excess of what is medically necessary." (Dkt. 81 ¶ 105). Creating false narratives in patient notes is not mentioned elsewhere in the Complaint. There is, moreover, no allegation about the content of the false narratives or whether they were included with any submitted claims. It is therefore impossible to determine whether the statements were material. Similarly, there is no indication of when the false narratives were provided or for which services or patients. Count II does not satisfy the specificity requirement of Rule 9(b) and is therefore due to be dismissed with leave to amend.

#### 2. The FFCA Claim

**\*7** Defendants similarly argue that Bell failed to plead the FFCA count with the required level of specificity, including detailing the submission of a false claim submitted to the State of Florida. (Dkt. 91 at 20-21). They also argue that 31 U.S.C. § 3732, rather than 28 U.S.C. § 1367, provides supplemental jurisdiction in the false claims context, and that the statute's criteria are not met. (Dkt. 91 at 22).

In her Complaint, Bell cites both statutes and contends "[p]ursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the FFCA on the grounds that the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution." (Dkt. 81 ¶¶ 6, 8). And in her opposition, she adds that "[c]ourts have supplemental jurisdiction over related claims. Here, the State false claims mirror (and even overlap) the Federal claims, and it is completely appropriate for a *qui tarn* relator to file both her federal and state false claims act claims together in one action." (Dkt. 99 at 13). Bell's contention is without merit.

First, 31 U.S.C. § 3732 provides the criteria for supplemental jurisdiction over state law claims in FCA cases. Courts have found that § 1367 does not apply "if another federal statute expressly provides different criteria for the exercise of supplemental jurisdiction," as with § 3732. *See, e.g., U.S. ex rel. King v. Solvay S.A.*, No. CIV.A. H-06-2662, 2015 WL 5692859, at \*2 (S.D. Tex. Sept. 28, 2015).

Second, and in any event, neither statute's requirements are met. As § 3732 provides, "[t]he district courts shall have jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State

or local government if the action arises from the *same transaction or occurrence* as an action brought under" the FCA. (emphasis added). Bell's FFCA claim is based on Defendants' alleged appropriation of patients' Medicaid allowance in order to purchase furniture for their facilities and their reluctance to perform services not covered by Medicare. (Dkt. 81 ¶¶ 89-93). Despite her vague conclusion that the claims "overlap," this conduct does not constitute the same transaction or occurrence as the allegations giving rise to the FCA claim, such as unnecessary medical services and maximizing and resetting 100-day patient stays. Nor is it "so related to the [FCA] claims ... that [it] form[s] part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

Bell alleges a violation of Fla. Stat. § 68.082(2)(a), which tracks 31 U.S.C. § 3729(a)(1)(A). *See Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x. 718, 719 n.1 (11th Cir. 2012) (applying FCA analysis to FFCA claims). However, she does not allege the presentment of a false claim to the government, much less with requisite specificity. Rather, the Complaint alleges conduct subsequent to the *patients* obtaining money from the government. The presentment requirement cannot be met by alleging improper activity independent to the submission of a false claim. *Hopper*, 588 F.3d at 1326 ("Improper practices standing alone are insufficient to state a claim ... absent allegations that a specific fraudulent claim was submitted to the government."); *see also Escobar*, 136 S. Ct. at 2003 ("The [FCA] is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." (internal quotation marks and citation omitted)). Additionally, she does not allege any basis for her personal knowledge of any submitted claims. Accordingly, the Court lacks jurisdiction over the FFCA claim and Count III is due to be dismissed.

3. Venue

**\*8** Defendants contend that because the Complaint alleges fraudulent activity that occurred at the CGC facility and the individual parties reside in the Southern District of Florida, the Middle District is an improper venue. (Dkt. 91 at 21-22; Dkt. 102 at 21). [10] Dismissal on this basis is unwarranted.

In the Complaint, Bell asserts venue is proper because Defendants "transact business" in the district. (Dkt. 81 ¶ 9). And in her oppositions to the motions to dismiss, she observes that "this case has been investigated (and continues to be investigated) by the U.S. Attorney Office for the Middle District of Florida, and Defendants can be found in this venue." (Dkt. 99 at 13). Indeed, 31 U.S.C. § 3732(a) provides that an FCA claim "may be brought in *any* judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, *or* in which any act proscribed by section 3729 occurred." (emphasis added). That Defendants can be found or transact business in the Middle District, which they do not contest, satisfies the statute. Accordingly, venue is proper, and this part of the motion is due to be denied.

4. Shotgun Pleading

In a footnote, Cross Garden argues the Complaint "is an example of shotgun pleading that warrants dismissal under Rules 8 and 10, as described in [its] motion to dismiss the [First Amended Complaint]." Dkt. 91 at 2 n.2. Although the counts in the Complaint do incorporate by reference the background allegations, they no longer incorporate the allegations of the preceding counts. (*See* Dkt. 20 ¶¶ 124, 129). Moreover, the allegations in each count sufficiently describe the factual basis for the claim to put Defendants on notice. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015) ("The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."). They also specify that "CGC, at the direction of Karl cross," engaged in the allegedly violative conduct. Because the allegations put Defendants on notice of the claims against them, this is not a basis to dismiss the Complaint.

**CONCLUSION**

Accordingly, Defendants' motions to dismiss are **GRANTED in part** and **DENIED in part.** (Dkt. 91, 102). Counts II and III are **DISMISSED without prejudice.** Bell is granted leave to file an amended complaint within twenty (20) days of the date of this Order or file a notice of her election not to amend. Within fourteen (14) days of the filing of Bell's amended complaint or notice, Defendants shall respond. The stay of discovery remains in effect. (Dkt. 120).

**DONE AND ORDERED** this 3rd day of December, 2019.

**All Citations**

Slip Copy, 2019 WL 6493972

Footnotes

1. To support her length of stay claim, Bell cites the CMS Medicare Benefit Policy Manual, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c03.pdf. She does not provide any authority, however, for the proposition that resetting the 100-day period for a patient readmitted within 30 days is not allowed. (Dkt. 81 ¶ 74). The manual explains that "a 'Benefit period' is a period of consecutive days during which medical benefits for covered services, with certain specified maximum limitations, are available to the beneficiary," which is "renewed when the beneficiary has not been an inpatient of a hospital or of a SNF for 60 consecutive days." CMS Medicare Benefit Policy Manual, ch. 3 § 10. It further provides that a "patient having hospital insurance coverage is entitled ... to have payment made on his/her behalf for up to 100 days of covered inpatient extended care services in each benefit period." *Id.* § 20.
2. Karl Cross raised arguments substantively similar to Cross Garden and joined its motion. (Dkt. 102).
3. Bell argues that Defendants "conflate[ ] personal knowledge with specificity – contending that a relator must prove both, at the mere pleading stage." (Dkt. 99 at 5). However, even if a relator "assert[s] ... direct knowledge of [a] defendant['s] billing and patient records, she still must allege specific details about false claims to establish the indicia of reliability necessary under Rule 9(b)." *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1276 (11th Cir. 2018) (internal quotation marks and citations omitted).
4. For example, although Bell explains that patients who have a high level of independence or a poor rehab prognosis are not good candidates for rehab therapy and alleges Defendants categorized patients into higher RUG levels to obtain higher reimbursements (Dkt. 81 ¶¶ 41, 47-48), she does not link a patient's level of independence or rehab prognosis to his RUG level. Nor does she allege with specificity that RUG levels were falsely inflated and that false claims were submitted. She does not, for example, provide examples of patients whose RUG levels were falsely inflated. And while Karl Cross' alleged statement, "We need to get these RUG levels up" (Dkt. 81 ¶ 66), might suggest scienter, it does not demonstrate that false claims were submitted and paid.
5. In support, Defendants rely on *AseraCare, Inc.*, 938 F.3d 1278. (Dkt. 111). As the United States and courts have noted, however, *AseraCare*'s procedural posture was unique. (Dkt. 122); *see, e.g., United States ex rel. Dildine v. Pandya*, 389 F. Supp. 3d 1214, 1220 (N.D. Ga. 2019). Following a partial trial on the merits, the district court granted summary judgment in favor of the defendant on the basis of falsity. *AseraCare*, 938 F.3d at 1281. And the language in *AseraCare* limited its application to the context of Medicare reimbursement for hospice services, which requires a provider's claim certifying that a patient is terminally ill "based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness." 938 F.3d at 1282 (citations omitted).
6. Bell provides dates of patient stays rather than dates of claims, and she does not distinguish between payments made on legitimate rather than false claims. She acknowledges, for example, that patient P.G., who was in the facility for 100 days, required services for less than a month. (Dkt. 81 ¶ 81). But she merely alleges that Medicare "paid close to $24,000 for patient P.G." (Id.). These deficiencies are not fatal at this stage, but may be insufficient to survive summary judgment, as this Circuit has found that in claims involving unnecessary medical services "representative claims with particularized medical and billing content matter ... because the falsity of the claim depends largely on the details contained within the claim form—such as the type of medical services rendered, the billing code or codes used on the claim form, and what amount was charged on the claim form for the medical services." *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 708 (11th Cir. 2014).
7. Under the FCA, "knowingly" means that "a person with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). Proof of specific intent to defraud is not required. *Id.*
8. "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). This is a "demanding" standard. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016).

9     In her opposition, Bell asks the Court to "make clear that Relator is entitled to discovery not only as to the examples alleged but as to any and all claims submitted by Defendant within the statute of limitations and running to the present that may fall within the ambit of the fraud scheme alleged." (Dkt. 99 at 13). She provides no authority in support of the request, which is in any event improperly raised in the opposition, rather than by motion.

10    Notably, Defendants move for dismissal, rather than transfer of venue under 28 U.S.C. § 1404.

---

**End of Document**            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

8